Filed 11/4/22; Certified for Publication 12/2/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>       v.<br><br>ISMAEL AVALOS,<br><br>    Defendant and Appellant. | G059107<br><br>(Super. Ct. No. 12NF1681)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Gregg L. Prickett, Judge. Reversed and remanded.

David P. Lampkin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Natasha A. Cortina and Melissa Mandel, Deputy Attorneys General, for Plaintiff and Respondent.

\*         \*         \*

A suspect's rights must be "scrupulously honored." (*Miranda v. Arizona* (1966) 384 U.S. 436, 478-479 (*Miranda*).) "To establish a valid [*Miranda*] waiver . . . , the prosecution must show . . . the waiver was knowing, intelligent, and voluntary." (*People v. Nelson* (2012) 53 Cal.4th 367, 374-375.) "Determining the validity of a *Miranda* rights waiver requires 'an evaluation of the defendant's state of mind' [citation] and 'inquiry into all the circumstances surrounding the interrogation.'" (*Id.* at p. 375.)

When a *Mirandized* suspect is being questioned by the police, and the suspect at any point says he wants to speak to an attorney, the police cannot question the suspect any further "until counsel has been made available to him, unless the *accused himself* initiates further communication, exchanges, or conversations with the police." (*Edwards v. Arizona* (1981) 451 U.S. 477, 484-485, italics added (*Edwards*).)

Once a suspect invokes the right to counsel, everything changes; that is, the police can no longer engage in efforts to convince the suspect to speak to them. (See *McNeil v. Wisconsin* (1991) 501 U.S. 171, 176-177.) This is because "'a change of mind prompted by continued interrogation and efforts to convince the defendant to communicate with the officers' cannot be considered a voluntary, self-initiated conversation." (*People v. McClary* (1977) 20 Cal.3d 218, 226-227, overruled on other grounds as stated in *People v. Cahill* (1993) 5 Cal.4th 478, 509-510, fn. 17.)

Here, police arrested 18-year-old high school student Ismael Avalos on a murder charge and questioned him in an interrogation room at a police station. During the interview, a forensic technician removed his shirt, pants, socks, and shoes. The technician gave him a paper gown to wear. After about five hours of questioning by police, Avalos said, "I wanna talk to a lawyer." After some further dialog, a detective said, "I respect your decision that you wanna talk to a lawyer, but if for some reason you want to change your mind and you wanna talk to me, you can, just ask for me. I don't care if it's 2:00, 3:00 in the morning I'll come back. Okay? *Because I care about you getting your story the right way out*. Okay?" (Italics added.)

2

After spending the night in a holding cell, Avalos told one of the jailers he wanted to speak to the detectives again. Avalos was brought back to the same interrogation room for a second interview, still apparently wearing the same paper gown from the day before. Avalos asked, "You guys don't have any socks do you?" An officer asked him if he was cold, Avalos said that it had been colder where he was being held. Avalos asked, "Whatever I tell my lawyer, he's going to tell you the same thing, right?" After waiving his *Miranda* rights, Avalos admitted shooting the murder victim, stating: "I, I self-defended myself, you know?"

Avalos was convicted of murder with a firearm enhancement and a substantive gang crime. On appeal, Avalos contends the trial court erred by admitting the second interview into evidence over his objection. Avalos also argues that due to a recent change in the law, his substantive gang conviction must be reversed.

Here, given Avalos's state of mind and the surrounding circumstances (Avalos was in high school with no record of prior arrests, his confusion about the role of a detective versus a lawyer, the apparent coldness, his clothes being taken away, and he was wearing a paper gown), we find Avalos did not make a voluntary, knowing, and intelligent *Miranda* waiver prior to the second interview. Further, given the detective's statement encouraging Avalos to speak to her because she cared about him getting his "story the right way out"—after he had invoked the right to counsel—it appears the detective, rather than Avalos, initiated the second interview. (See *Edwards*, *supra*, 451 U.S. at pp. 484-485, italics added [after invoking the right to counsel, police cannot question the suspect any further "unless the *accused himself* initiates further communication, exchanges, or conversations with the police"].) We further find the admission of the interview into evidence was not harmless beyond a reasonable doubt.

The Attorney General concedes Avalos' substantive gang conviction must be reversed and we agree. Thus, we reverse the judgment. On remand, the prosecution may retry Avalos consistent with the holdings of this opinion.

3

# I

## FACTS AND PROCEDURAL BACKGROUND

On Friday, May 25, 2012, at about 2:00 p.m., Avalos was drinking beer in his family's garage in Anaheim. Avalos was with some of his friends, including George Galvan. Avalos showed his friends a handgun.

At about 4:00 p.m., Galvan drove Avalos and two other young men to Balsam, an alley in Anaheim where young people hang out and drink. Avalos was tugging at his shirt and acting like he had a gun in his waistband. Avalos stayed at Balsam for several hours drinking beer.

At about 10:30 p.m., Galvan drove Avalos and others to a liquor store in Anaheim. Avalos and another man got out of the car and walked toward Mayfair Street, where 15 to 20 young people were hanging out in a cul-de-sac, including Angel Rivera (the victim). Parked in a nearby truck was Rivera's girlfriend, A. Albarran, who was Avalos' former girlfriend.

According to a witness, Avalos and his companion approached Rivera, who was holding a bag of Cheetos. Rivera raised his hands and said, "'What's up.'" Avalos and his companion lifted their shirts and drew guns. Rivera dropped the bag of Cheetos, froze, and yelled, "Oh, Sh*t." Rivera started to walk backwards. Albarran called out from the truck, "'Ismael, do not do it.'" Avalos and his companion fired two shots each. Rivera sustained a gunshot wound to his head.

Avalos and his companion ran down the street and into Galvan's car. Avalos looked nervous and said, ""'I lit some fool up.'"" Avalos said he "'dumped on someone.'" Galvan drove Avalos back to his house.

*Police Investigation*

Anaheim Police responded to the scene at 10:36 p.m. Rivera was lying in the middle of Mayfair Street with a lot of blood around him. Paramedics transported

4

Rivera to a hospital where he was pronounced dead at 11:12 p.m. Officers searched the area but found no firearms, shell casings, or other physical evidence.

Later that night, at about 1:00 a.m., B. Valenzuela went to the Anaheim Police Department. Valenzuela said she saw Avalos and another man walking towards Mayfair Street just prior to the shooting.

At about 10:30 a.m., police arrested Avalos as he was driving away from his home. Police searched Avalos' bedroom and found a pair shoes under the bed. Within one of the shoes was 44 rounds of .38 caliber ammunition. The police found a receipt from a Del Taco restaurant located near the crime scene; the receipt's time stamp was just after the time of the shooting.

Detectives K. Schroepfer and J. Trapp separately interviewed Avalos on the day of his arrest; Schroepfer again interviewed Avalos on the following day (the police interviews will be covered in detail in the discussion section of this opinion).

*Trial Court Proceedings*

The prosecution filed an information charging Avalos and Galvan with murder and a substantive gang offense (street terrorism). The information alleged a gang special circumstance, and a gang enhancement (as to the murder). The information further alleged Avalos personally discharged a firearm in the commission of the murder and a gang firearm enhancement.

In a pretrial hearing, Avalos objected to the admission of the second interview based on "*Miranda* and its progeny." The trial court reviewed the interview transcripts and the video recordings and overruled Avalos's objection. Redacted versions of the police interviews (without the *Miranda* warnings, waivers, and invocations) were admitted into evidence.

During the jury trial, Detective J. Pietras testified as a gang expert. Pietras opined that on the day of Rivera's shooting, Avalos and Galvan were both members of

5

the Anaheim Travelers City (ATC) criminal street gang.  Pietras testified that the location where the shooting occurred (Mayfair) was in an area claimed by Citron, a rival gang.

K. Velazquez testified that about a week prior to Rivera's shooting, there had been a carwash to raise money to cover funeral costs for another person that had been killed near Mayfair.  Rivera was at the carwash holding up a sign when Velazquez saw a white car.  Velazquez testified she heard a voice inside the car say, "'F*ck your dead homie.'"  Rivera replied, "'F*ck you.'"  Velazquez told the police the person inside the car was Avalos.  Velazquez told police Rivera wanted to fight, but Avalos drove away.

The jury found Avalos guilty of murder and street terrorism.  The jury found true the firearm enhancement but found not true the various gang enhancements.  Galvan was acquitted of all charges.  The court sentenced Avalos to 40 years to life.

II

DISCUSSION

Avalos contends:  A) the trial court erred when it overruled his *Miranda* objection to the second interview; and B) due to a recent change in the law, his street terrorism conviction must be reversed.  We shall address each contention in turn.[1]

*A.  The Miranda Ruling*

Our review is de novo.  "'On appeal, we review independently the trial court's legal determinations of whether a defendant's . . . *Miranda* waivers were

---

[1] The Attorney General argues Avalos forfeited his *Miranda* claim because he did not object on the same grounds in the trial court.  But the court's ruling was based exclusively on its review of the transcripts and the video recordings of the interrogations.  That same evidence is available to this court, and these are pure questions of law.  Therefore, we exercise our discretion to consider the *Miranda* issue.  (See *People v. Oneal* (2021) 64 Cal.App.5th 581, 590 ["a reviewing court has discretion to consider a forfeited issue that presents a pure question of law"].)

6

knowingly, intelligently, and voluntarily made [citation], and whether his later actions constituted an invocation of his [rights].'" (*People v. Suarez* (2020) 10 Cal.5th 116, 158.) "When 'an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review.'" (*Ibid*.)

In this part of the discussion, we will:  1) review general principles concerning the *Miranda* decision and subsequent case law; 2) summarize the police interviews; and 3) analyze the law as applied to the relevant facts.

### 1.  General Principles of Law

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  (U.S. Const., 5th Amend.)

When a person is in custody and is being interrogated, the person may feel compelled to testify against himself.  (*Miranda*, *supra*, 384 U.S. at pp. 444-445.)  "It is obvious that such an interrogation environment is created for no purpose other than to subjugate the individual to the will of his examiner.  This atmosphere carries its own badge of intimidation.  To be sure, this is not physical intimidation, but it is equally destructive of human dignity.  The current practice of incommunicado interrogation is at odds with one of our Nation's most cherished principles—that the individual may not be compelled to incriminate himself.  Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice."  (*Id*. at pp. 457-458.)

"We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.  In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and

7

the exercise of those rights must be fully honored." (*Miranda*, *supra*, 384 U.S. at p. 467.)

"Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." (*Miranda*, *supra*, 384 U.S. at p. 444.)

Courts decide whether a *Miranda* waiver is valid or not. "To establish a valid waiver of *Miranda* rights, the prosecution must show by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary." (*People v. Nelson*, *supra*, 53 Cal.4th at pp. 374- 375.) "Determining the validity of a *Miranda* rights waiver requires 'an evaluation of *the defendant's* state of mind' [citation] and 'inquiry into *all the circumstances* surrounding the interrogation.'" (*Id.* at p. 375, italics added.) Relevant circumstances include the suspect's age, experience with the criminal justice system, level of education, intelligence, and the suspect's ability to understand the rights being explained by the officer. (*People v. Neal* (2003) 31 Cal.4th 63, 83-84.)

If a suspect chooses to invoke his constitutional rights, the Supreme Court later "established another prophylactic rule designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." (*Michigan v. Harvey* (1990) 494 U.S. 344, 350.) The United States Supreme Court held that an accused "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the *accused himself initiates* further communication, exchanges, or conversations with the police." (*Edwards*, *supra*, 451 U.S. at pp. 484-485, italics added.)

Under the long standing *Edwards* rule: "If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in

8

custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a [*Miranda*] waiver and his statements would be considered voluntary under traditional standards." (*McNeil v. Wisconsin*, *supra*, 501 U.S. at pp. 176-177.)

The fundamental purpose of the *Edwards* rule "'is to "[p]reserv[e] the integrity of an accused's choice to communicate with police only through counsel," [citation], by "prevent[ing] police from badgering a defendant into waiving his previously asserted *Miranda* rights," [citation].' [Citation.] These benefits are typically realized in 'the paradigm *Edwards* case. That is a case in which the suspect has been arrested for a particular crime and is held in uninterrupted pretrial custody while that crime is being actively investigated. After the initial interrogation, and up to and including the second one, he remains cut off from his normal life and companions, "thrust into" and isolated in an "unfamiliar," "police-dominated atmosphere," [citation], where his captors "appear to control [his] fate."'" (*People v. Molano* (2019) 7 Cal.5th 620, 655.)

After invoking the right to counsel during questioning, a suspect may later change his mind, but the police cannot prompt or encourage a suspect to change his mind. (See *People v. Randall* (1970) 1 Cal.3d 948, 956-957, fn. 7, overruled on another ground in *People v. Cahill* (1993) 5 Cal.4th 478, 509-510, fn. 17.) "[A] change of mind on the part of the defendant prompted by the advice of counsel, his own psychological make-up, or similar facts" is permissible. (*Ibid*.) "On the other hand, 'a change of mind prompted by continued interrogation and efforts to convince the defendant to communicate with the officers' cannot be considered a voluntary, self-initiated conversation." (*People v. McClary*, *supra*, 20 Cal.3d at pp. 226-227.)

### 2. Police Interviews

Anaheim Police Detectives Schroepfer and Trapp separately interrogated Avalos on the day of his arrest. The following day, Schroepfer again separately

9

interviewed Avalos.  The interviews were videoed and transcribed.

*The First Interview* (*the Day of the Arrest*)

Detective Schroepfer began interviewing Avalos in a small interrogation room starting at about 12:10 p.m.  Schroepfer's portion of the interview lasted about three hours.[2]  Avalos was handcuffed to a table.

"SCHROEPFER:  Um, what I'd like to do is talk to you about an incident that happened last night.

"AVALOS:  Uh-huh.

"SCHROEPFER:  Okay? Um, you're sittin' there with a handcuff on.

"AVALOS:  Uh-huh.

"SCHROEPFER:  Okay. Um, what I'm going to do is I'm gonna read you your *Miranda* Rights.  Okay?  Just answer yes or no, we'll go from there.  You have the right to remain silent.  Do you understand?

"AVALOS:  Yes.

"SCHROEPFER:  Anything you say may be used against you in court.  Do you understand?

"AVALOS: Yes.

"SCHROEPFER:  You have the right to the presence of an attorney before and during any questioning.  Do you understand?

"AVALOS:  What do you mean an attorney like . . .

"SCHROEPFER:  Yeah.  You have the right to the presence of an attorney before and during any questioning.

"AVALOS:  That means that *** someone can tell me something like *** (SPEAKING SIMULTANEOUSLY) . . . .

---

[2] Three asterisks indicate "unintelligible conversation."  Boldfacing omitted throughout.

"SCHROEPFER: Yeah.

"AVALOS: Oh, okay.

"SCHROEPFER: Like an attorney.

"AVALOS: Okay.

"SCHROEPFER: Yes. Yes or no?

"AVALOS: Yes, yes.

"SCHROEPFER: Okay. If you cannot afford an attorney one will be appointed for you free of charge before any questioning if you want. Do you understand that?

"AVALOS: Yes.

"SCHROEPFER: Okay. Um, have you ever been arrested before?"

"AVALOS: No. Oh, yeah, I have but like when I was a minor still for some dumb thing."

Avalos said he was 18 years old and a senior in high school. Detective Schroepfer told Avalos his name had come up regarding an investigation regarding a shooting the night before. Avalos said he went to bed about 10:30 p.m. Avalos said Galvan was at his house in the early evening. Avalos claimed, "I've never even stepped foot on Mayfair before in my life." Avalos generally denied being a current member in any gangs. Avalos said he didn't mind that his former girlfriend was dating Rivera.

Detective Schroepfer told Avalos they checked his friend Galvan's ankle bracelet (who was on probation) and said this showed that Galvan left Avalos's house at about 10:30 or 11:00 p.m. and was near Mayfair Street. Avalos denied being in Galvan's car the previous night.

Avalos said he had his cell phone on him the previous day. Detective Schroepfer told Avalos his cell phone revealed he was in the vicinity of the shooting at about 10:30 or 10:35 p.m. Avalos then said he loaned his phone out to a friend, but he wouldn't say who it was.

11

After the interview had gone for about an hour and 10 minutes, Detective Schroepfer said, "we're going to take a break. We are going to take your photos. We're gonna take some DNA. Okay? And, um, we're gonna take . . . probably your jeans and your shoes." Avalos asked, "Can I get something to eat? I haven't even ate breakfast. I'm kind of hungry." Schroepfer said, "Let me see what I can rustle up for ya. Okay?" Avalos asked for more water.

At about 1: 40 p.m., Detective Schroepfer's interview was interrupted for a forensic procedure. A male technician had Avalos take off his shirt, pants, socks, and shoes. After taking photographs of Avalos' body, he was given what appears to be a paper gown. Police again handcuffed Avalos to the table in the interrogation room. Avalos was given some food to eat at the table.

At about 2:00 p.m., Detective Schroepfer reentered the interrogation room and confronted Avalos with the evidence recovered from his home (the receipt from Del Taco the previous night, near the area of the shooting). Avalos then admitted "I got caught up in the mix. . . ." He said, "But I didn't shoot nobody." Avalos said that he and his group had stopped at a liquor store, they heard "boom, boom" and then went to Del Taco and back to his home.

At about 2:45 p.m., Avalos asked Detective Schroepfer how long he was going to be held. Schroepfer said, "Oh, probably overnight." Avalos said, "I don't mind you guys holding me until you guys . . . [¶] . . . [¶] . . . find out or whatever . . . ." Schroepfer said, "I appreciate that." Avalos asked, "Can I get a phone call or?" Schroepfer said, "Um, we'll take you downstairs and you can make some phone calls. Okay?" Avalos asked, "In like in how long?" Schroepfer said, "Um, I don't know. Give me about ten minutes or so. Alright?"

Starting at about 3:00 p.m., Detective Trapp entered the interrogation room and began asking questions. Trapp's portion of the interview lasted about two hours. Trapp asked, "they gave you some food, huh?" Avalos responded, "Yeah." Trapp

12

confirmed Avalos was 18 years old.

Detective Trapp said, "Here's the deal mijo (son) I just came from your parents' house." Trapp said, "You have a really nice dad, a really nice mom, and a really nice sister, very pretty. Um, seems like your parents have tried pretty hard to give you, you know, the best that they could, and, uh, I think you'll agree that you've made some mistakes in your life." Avalos responded, "Yeah." Trapp said, "Okay? Mistakes are mistakes. Okay? And you're making a big one right now." Avalos asked, "How am I making a big mistake?" Trapp said, "Because you're not being honest." Avalos said, "Well I am being honest." Trapp responded, "No esperate (wait), listen, hear me out. Okay? You know that you've lied."

After Avalos claimed to have told the truth to Detective Schroepfer, Detective Trapp said, "Well you told her part of the truth. And I think that's a step in the right direction mijo (son) I really do. . . ."

Detective Trapp said, "There's lots a different reason why people make mistakes, and people can always overcome their mistakes because let me tell you mijo (son) and explanation . . . goes a long way. Let me give you an example. Okay? Huhhh [[*sic*]]. Let's say your sister, God forbid, que no pase (that does not happen), let's say she got cancer, and your dad's medical insurance didn't cover it, and she needed medicine, and it was really, really, really f*ckin' expensive, but if she didn't get this medicine she's gonna die, and you being the caring brother that you are, you did what you had to do and you go jack someone for money. Not because you wanted to, but because desesperacion (of desperation), right?"

After some further discussion, Avalos said, "So what're you guys tryin' to say I shot him or what?" Detective Trapp responded, "What I'm trying to say mijo (son) is that this is your opportunity to explain why . . . you went along with what happened."

Avalos said he "just told you guys." Detective Trapp responded, "Look at me, look at me. You and I are beyond that. Beyond that. I'm not here for you to lie to

me.  That's not why I'm here.  I'm here because I met your family and I now know the kinda person that you are, and yes, you've made mistakes, . . . but a lot of people . . . at the bottom of their heart they're still good people, okay, who make mistakes.  Every day people make mistakes.  Sh*t I've made mistakes.  But before, okay, there's different kinda people. . . .  And I want to help you explain, because you and I we're beyond the story of I wasn't there.  I'm tellin' mijo (son) that is not gonna work."

Avalos continued to say he was not on Mayfair Street.  Detective Trapp said, "Mijo (son), mijo (son) look at me.  I promise you, . . . that the story about how you were [not] on Mayfair will not work out for you, and no seas tonto (don't be stupid)."

Avalos asked, "What do you want me to say?"  Detective Trapp said, "Tonto (stupid)."  Avalos said, "Well I shot the gun or what?"  Trapp said, "No, I don't want you to say that."  Avalos asked if she wanted him to take "the blame for something" that "I didn't do?"  Trapp said, "Listen to me.  Look at me.  I do not want you to take the blame.  Nor do I want you to rat . . . on anybody who was with you, because that's not you."  Avalos said, "That's not me."  Trapp said, "That's . . . , you're right.  All I'm asking you to tell me is your explanation of why you got involved.  Okay?  Listen to me. If you're f-, whatever, I'm not gonna-, I-, you have my word."

Avalos responded, "I just got caught up in the mix, you know."  Detective Trapp asked, "Can you a-, can you explain to me why you walked down Mayfair?  What did you-, this is, this is the important part.  Okay?  What did you think was gonna happen when you walked down?"  Avalos responded, "Nothing.  Nothing."  Avalos said, "I was at the wrong place at the wrong time."

Avalos said, "All I gotta say is that I didn't shoot . . . ."  Detective Trapp said, "But listen to me.  Listen to me.  I wanna believe you . . . based on what I've . . . seen about your parents and based on what I've seen about your home life I believe you, but I need you to tell me why, and I'm not . . . , you got my word, I am not gonna f*ckin' ask you who you were with.  That's not for, that's not for you to say.  Okay?  That's

something you keep to yourself.  Okay?  All I wanna know is why you walked down the street with him.  That's it.  Don't tell me . . . what he did.  It's . . . his business.  Why did you walk down Mayfair?"  Avalos said, "Just to go with him."

Avalos said, "A guy ran up to us and I don't know he started saying, you know, 'Citron' or whatever the f*ck.  I don't know it looked like he had something . . . just 'cause that guy got shot.  He got shot and we took off running, you know.'"  Detective Trapp asked, "Did . . . your friend say anything?"  Avalos said, "Nah.  The guy I was with just shot him and sh*t."

After some further discussion, Avalos asked, "Am I gonna be held till someone gets caught or what?"  Detective Trapp said, "Well I mean here, here's, here's the deal, um, I mean I'm gonna be real honest with you, okay?  I gave you my word.  I'm not gonna ask you who was with you.  Okay?  But, yeah, I mean that detective and my boss, you know, they're not gonna let you go unless you tell 'em who, who the shooter is.  And I know that's a big decision on your part, and, you know what, only you can make that decision.  Only you can decide, you know . . . and I'm not gonna ask you for it 'cause I gave you my word that I wouldn't.  That's a decision you have to make."

After some further discussion, Avalos said, "still they know where I live, you know, . . . it's gonna go to me, you know, like what, you know what I mean, f*ck that.  I'd, I'd rather do . . . f*ck it I'll do the time."  Detective Trapp asked, "You'd rather do the time?"  Avalos responded, "Well there's nothing else I can do.  What am I gonna do?  Nothing.  Sit here all f*ckin' day shackled.  Only thing I can do, you know.  It just sucks, but . . . ."  Trapp asked, "why did [Galvan] even drive this guy there?"  Avalos said, "those weren't the intentions.  We were right there at the liquor store."

Detective Trapp asked, "how did it go from you guys hangin' out" and then "bein' at the liquor store to this guy wanting to go into rival territory?"  Avalos said, "I don't know.  Where, where you, where you guys gonna take me from here . . . ?"  Trapp said, "Well your mom and dad are here and they wanna see you."  Avalos asked,

15

"They're gonna come in here?" Trapp said, "Yeah. Is that okay? Do you wanna see 'em? I mean it's up to you you're an adult now." Avalos said, "Yeah. I'll see 'em."

Detective Trapp asked Avalos further questions, including questions about his relationship with his former girlfriend (Albarran) and her current relationship with the shooting victim (Rivera). Avalos said, "I don't care about her. I do, the baby, you know, but not her, even . . . though the baby's not even mine I still take care of him sometimes." Trapp said, "the only reason I'm asking is you're gonna have to explain and y-, and if you think of an explanation because the guy that, uh, your friend shot he was seeing your old lady." Avalos said, "Uh, oh yeah? No. I didn't know that." Trapp said, "I also have witnesses that saw you telling [Rivera] f*ck his barrio (neighborhood) during that carwash not too long ago when their other homie got killed." Avalos said, "I don't know about no carwash."

Detective Trapp said, "Let me go see if your parent [[*sic*]] are, are good to go. You ready to see 'em?" Avalos said, "Yeah." Avalos asked, "When, when am I gonna go to court or what?" Trapp said, "Well I, I'm telling you mijo (son) that, I mean, that all depends on you, you know, and I told you, I said, that you've got a decision to make." Avalos said, "Like what? What do you mean?" Trapp said, "Well I mean I, I told ya, I . . . all I can tell you is my boss and that detective are gonna wanna who, who, who shot that guy, and, you know, it's up to you." Avalos said, "Yeah. But, but you guys have me right now, you know, like I'm not even the shooter, you know, and like how does that-, how is that work or what?" Avalos said, "I'm gonna, I'm gonna just get busted or what?" Avalos said, "You know I don't wanna go to jail for some sh*t I didn't do, you know." Trapp said, "The problem is, is the explanation."

Avalos asked, "What should I say then[?]" Detective Trapp said, "Um, the truth. Why you walked down the street. Why you and this fool went down there. And you know you're not tellin' me the complete truth of why you guys chose to go down there." Avalos asked, "How's that gonna benefit me though[?]" Trapp said, "You know

16

what, I can't tell you because I don't know what you're tell [[*sic*]] me, because here's the thing, if the truth is that you went down there with him with the intention to blast someone, yeah, you're right, it's not gonna help you."

Avalos said, "Those weren't the intentions." Detective Trapp said, "Okay. Well then I want you to think about it. And, and, and, and decide whether you wanna tell me the truth about why you went down there, because I'm telling you an explanation can mean the difference. I'm not saying it will. I, I'm just telling you, because I don't know what you're gonna tell me, you know."

Avalos said, "I went over there, you know, we saw [Rivera], he told me sh*t, he came across, you know, 'cause he already knows, you know, who I am . . . ." Detective Trapp asked, "Why does [he] have [a] beef with you?" Avalos said, "I've had a beef with him from like f*ck sixth grade, . . . I don't know like we never liked each other, you know, . . . he's crazy, you know." Avalos said his friend "seen how he was acting, you know, like I don't know I thought I don't know, and he just got shot and like f*ck I'm gone, f*ck this, you know. I d-, I jammed . . . . I took off and then I seen that sh*t, and I didn't even look back. I didn't even wanna see that sh*t. That just scared the sh*t out a me. And my stomach feels funny still I seen him f*ck."

Avalos said he went to confront Rivera about what happened at the car wash. He said, "like my friend just went boom, I don't know like I just, I just seen like flame right here and shit, my ears started ringing." Avalos said he ran away after the shots were fired, called Galvan and was picked up. Avalos said, "I didn't even know he had a cuete (gun) on him. That was it though. I just ran and sh*t."

Detective Trapp said, "Well let me, let me, uh, let me talk to the detective and that way it gives you some time to visit with your parents too. Okay?" At about 4:08 p.m., police brought Avalos' parents into the interrogation room for about 10 minutes. Avalos told his parents, "I was just there but I didn't do anything." Avalos' mother said, "I pray to God. I pray to God that it wasn't you who got the gun." Avalos said, "I

17

already told them." Avalos' mother said, "Say that you didn't get it. You didn't shoot."

Avalos' father said, "Okay that's better. That's good for you if that's how things went, that's good for you son. Let's see if now, let's go see a lawyer and see what they say. To see how things look, the case and all that." "I'm going to give my brother, CARLOS a call right now . . . to see if they know, the one that, . . hired . . . see what he says, okay?"

Avalos said, "I'm going to be here for awhile." Avalos' mother said, "But you didn't do anything." Avalos said, "For being there. That's what I'm telling you. I hope that they won't give me a long time, that's what I'm praying . . . ." Avalos asked, "Now how do I get out with money?" Avalos asked, "There isn't any, right? There isn't an offer?" Avalos' mother said, "Your dad said we're going to get a lawyer. Even if we go hungry but I just don't want you to stay here . . . ."

Avalos' mother asked, "They have you chained up? Your feet too?" She asked, "So then how do you eat?" Avalos said with "his left hand." Avalos' mother asked, "Is it bad where they're going to take you now?" Avalos said, "I don't know. They have me in here all f*cking day."

Avalos asked about the bullets under his bed. Avalos said, "I can't say it was me until they find a gun . . . ." Avalos asked, "What did they tell you?" Avalos's mother said, "Nothing. That they're only investigating because there was a death and that they believe it was you, that you were right there." In response to repeated questions, Avalos said, "I didn't shoot."

After Avalos' parents were taken out, Detective Trapp reentered the interrogation room. Trapp said, "there's . . . been a lot of other people that have come forward." Avalos said, "I didn't do nothin' I didn't, I didn't pull that trigger." Trapp said, "I think we can explain why you lied at the beginning. I think we can, because it's totally natural to be, you know, freaked out about what happened. So I think that we can total explain why that happened. Okay? I, I think we can. Um, and, you know, a lot of

what you told me totally makes sense, and I think that we can totally present it, you know, like, like you were saying that it happened. The part that we need to figure out is there's witnesses that have identified you, and here's the thing, I mean I talked to your mom and your, your mom isn't convinced because she knows you. She knows since you were a little kid and she knows what you do when, when you're bein' honest and she knows what you do when you're not."

Detective Trapp said, "And what she told me is that, you know, if my son did it, there's an explanation. There, there's, there's a reason why, 'cause my son isn't a, you know, . . . she say, he has a heart, he's not like that." Trapp said, "Well here's the thing mijo (son) because your mom knows you. Your mom knows what you've-, and, you know what mijo (son) I think it's a good thing. I think it's a great thing that you can't look at your mom in the eye and lie to her. You wanna know why? 'Cause that means you respect your mother and it means that you do have heart like she told me you did. 'Cause you do. . . . Here's the thing if you went over there like you told me just to confront him, just to fight one-on-one, toe-to-toe, and, and whatever he f*ckin' reached ***, you know, whatever. I mean there's-, I, I know there is a reason. I know that you didn't go over there with the intention to shoot him. I think you went there to confront him, but I think that once, once you were there I think f*ckin' shit went wrong, and I think that in a f*ckin' instant you had ta f*ckin' make a decision. I think that's what happened. I think it was just like fuck, you know, this is what-, this is not what I came here for and *** fuck now I'm being forced to make this decision."

Detective Trapp said, "You're the only one that has that explanation 'cause you are the only one that knows why you chose to make that decision. And mijo (son) your own mom, your own mom when she left here crying, you know what she said to me as passed me?" Avalos asked, "What?" Trapp said, "She-. She, uh, she told me, oh, ma'am . . . . Um, I want to think that it wasn't my son but I'm not sure. (PAUSE). You wanna know why that is? I, I have kids and I know when my kids lie to me."

19

Avalos asked, "Am I gonna be in here for a long time still in here, in this room?" Avalos asked, "Can I go use the restroom?" Detective Trapp said, "Yeah." Avalos said, "I need to take a sh*t." Trapp said, "You need ta take a sh*t? I think you should really think about it." At about 4:45 p.m., the following exchange took place:

"AVALOS: I'm not gonna, I'm not gonna plead guilty to something I didn't do.

"TRAPP: I'm not asking you to plead guilty. That's the last thing I want you to do.

"AVALOS: I'm not gonna do that. I don't need to do that sh*t. I can't talk to a lawyer or nothing or what*?

"TRAPP: You can.

"AVALOS: Can I talk to a lawyer? *** she telling me you wanna get a lawyer.

"TRAPP: Sure. You can do that.

"AVALOS: Yeah. That's what I wanna do. I wanna talk to a lawyer.

"TRAPP: Okay.

"AVALOS: I don't wanna say anything no more just tell 'em *** I just wanna talk to a lawyer.

"TRAPP: Okay. That's definitely your choice. Alright.

"AVALOS: Think that's a good choice or not?

"TRAPP: That's, that's . . . I, I can't make that choice for you. That's something that you have to decide. But, you know what, I'm gonna take you downstairs so you can go to the bathroom. Okay? And I know this is gonna sound weird but I married a white boy so my last name is TRAPP. Can y-, can you repeat that?

"AVALOS: TRAPP?

"TRAPP: TRAPP, Yeah. You know what, go down you think about it, you know, if you think that's the right choice for you, great, you know.

20

"AVALOS: Well I'm gonna go tell 'em . . .

"TRAPP: Huh?

"AVALOS: . . . that it was, huh?

"TRAPP: Huh?

"AVALOS: I gonna go down being there

"TRAPP: Well no. All I'm saying is, is, is I respect your decision that you wanna talk to a lawyer, but if for some reason you change your mind and you wanna talk to me, you can, just ask for me. I don't care if it's 2:00, 3:00 in the morning I'll come back. Okay? Because I care about you getting your story the right way out. Okay?"

*The Second Interview* (*the Day After the Arrest*)

The following day at about 8:45 p.m., police brought Avalos back into the same interrogation room. It appears from the video that Avalos was still dressed in the same paper gown from the day before.[3]

Detective S. Wyatt first entered the interrogation room and asked Avalos, "Too cold down there?" Avalos said, "It's colder up here." Wyatt asked, "Is it? Do you need a blanket?" Avalos said, "No. I'm ok." Wyatt asked, "You're ok?" Avalos said, "You guys don't have any socks do you? No huh?" Wyatt said, "I don't think so. Let me check." After a few minutes, Wyatt returned and said, "I have a pair of socks in my locker, that are like a spare set, if you want those, I get them for you." Avalos said, "Na that's okay." The following exchange then took place:

"DET. WYATT: You good with your drink?

"AVALOS: Yeah, I have a question, uhm.

"DET. WYATT: Yeah.

"AVALOS: Whatever I tell my lawyer, he's going to tell you the same

---

[3] Avalos was apparently held overnight in a holding cell in the Anaheim Police Department, rather than being transported to the Orange County jail.

thing, right?

"DET. WYATT:  No necessarily, I *** umm, I want to talk to you about that."

After Detective Wyatt left the interrogation room, Detective Schroepfer entered the room and began the second interview, which lasted about 45 minutes.

"INV. K. SCHROEPFER:  You asked for a pair of socks?

"AVALOS:  Yeah, but it's ok.

"INV. K. SCHROEPFER:  Ok, because I can give you some really, you know?  Fancy pair of chicks running socks.  You know?  Stripes or hearts, something really stupid on them.  Umm ok umm from what I understand, yesterday afternoon when you were talking with Detective TRAPP.  You told her that you would like to talk to a lawyer first, is that correct?

"AVALOS:  Hu-huh.

"INV. K. SCHROEPFER:  Ok.

"AVALOS:  It make a difference if I talk to a lawyer first or you guys?

"INV. K. SCHROEPFER:  You know, I can't tell you either way, it, that makes, you know, that's your decision but since you did asked for a lawyer, I want to understand is you contacted umm one of the jailers and asked to talk to the detectives again.  [[*sic*]].  Is that right?

"AVALOS:  Umm.

"INV. K. SCHROEPFER:  Yes or no?

"AVALOS:  Yes.

"INV. K. SCHROEPFER:  Ok, so you did want to talk to us, you had, you, I take it you have some questions you want to ask, ok, is that it?

"AVALOS:  Uh-huh.

"INV. K. SCHROEPFER:  All right, umm if you want to continue talking to us, you're on free will.  Nobody is forcing you, right?

"AVALOS:  Uh-huh.

"INV. K. SCHROEPFER:  Nobody is forcing you, and nobody's promised you anything, right?

"AVALOS:  Correct.

"INV. K. SCHROEPFER:  Unless you want to call wild cherry Pepsi a promise, all right?  But umm what I want to do then is, I'm going to read you, your *Miranda* rights again, so you understand.  And then if you have any questions, you can start asking questions, ok?

"AVALOS: Ok.

"PAUSE:

"INV. K. SCHROEPFER:  So umm if you would, just umm listen up and say yes or not. You have the right to remain silent, do you understand?

"AVALOS: Yes.

"INV. K. SCHROEPFER:  Anything you say may be used against you in court, do you understand?

"AVALOS:  Yes.

"INV. K. SCHROEPFER:  You have the right to the presence of an attorney before or during any question, do you understand?

"AVALOS:  Yes.

"INV. K. SCHROEPFER:  If you cannot afford an attorney, one will be appointed for you, free of charge before any questioning if you want, do you understand that?

"AVALOS: Yes."

Avalos said he wanted to get to the bottom of it and just say what happened.  Avalos said he was walking down Mayfair and saw two guys.  One of them, Rivera, approached him and said something like "your *** days are over my boy or something like that."  Avalos said Rivera reached towards the right side of his waistband

23

and he got scared. Avalos said he and Rivera have never gotten along.

Avalos said that after Rivera said, "your days are over. And I just like, I just turn around and I just see him reaching on it, I got scare, you know like, I just pulled out the gun and I shot him, you know like, I don't know, I fear for my life, so I just shot him [(*sic*)]." Avalos said, "I, I self-defended myself, you know?'

Avalos said he fired the gun about four times. Avalos eventually identified the person he was with as David. Avalos said he was carrying the gun for protection and was not planning to use it. Avalos eventually said, "I don't want to say nothing no more. I just want to go back to my room and go to sleep."

After further questioning, Avalos said, "I don't want to say anything more until I see my lawyer." Detective Schroepfer responded, "Ok, all right, I understand. Umm but like I said this DAVID. We need to talk to him like now to back your story, ok? Not after you sat in jail for six months, ok?" The interview was then concluded.

### 3. *Application and Analysis*

On the day of his arrest, after about five hours of questioning, Avalos invoked his right to counsel by saying, "I wanna talk to a lawyer." Detective Trapp acknowledged Avalos had invoked his right to counsel by stating: "I respect your decision that you wanna talk to a lawyer." Under *Miranda* and its progeny, all questioning should have stopped until Avalos was provided an attorney. An exception exists if Avalos *himself* changed his mind and initiated further "conversations . . . with the police." (See *Edwards*, *supra*, 451 U.S. at pp. 484-485; see also *Maryland v. Shatzer* (2010) 559 U.S. 98 [*Edwards* rule applies for 14 days if there is no break in custody].)

However, rather than scrupulously honoring Avalos' invocation, Detective Trapp encouraged Avalos to speak to her further *without* the presence of an attorney by saying, "but if for some reason you change your mind and you wanna talk to me, you can, just ask for me. I don't care if it's 2:00, 3:00 in the morning I'll come back. Okay?

*Because I care about you getting your story the right way out*.  Okay?"  (Italics added.)

Detective Trapp's statement purporting to care about Avalos getting his story "the right way out," had no conceivable purpose other than to encourage Avalos to continue to talk to her (without the presence of counsel).  Certainly, police can engage in any number of tactics designed to persuade, encourage, or even trick a *Mirandized* suspect into continuing to communicate.  Ordinarily, these tactics are perfectly acceptable.  For instance, in this case, there was absolutely nothing wrong with Trapp establishing a motherly rapport with Avalos by calling the murder suspect "mijo" or "my son."  However, once Avalos invoked the right to counsel, everything changed.  From that point forward, Trapp was required to scrupulously honor Avalos' invocation of his right to counsel, and she was prohibited from encouraging Avalos to speak to her any further.  (See *McNeil v. Wisconsin*, *supra*, 501 U.S. at pp. 176-177.)

The Attorney General argues:  "The only potentially objectionable statement Detective Trapp made at the conclusion of the interview on the first day was, in explaining why she would make herself available if [Avalos] wanted to resume talks, 'Because I care about you getting your story the right way out.'"

The Attorney General argues Detective Trapp's "isolated statement" was simply "police exhortation urging the suspect to talk to them."  The Attorney General argues there is a line "between 'mere police exhortation urging the suspect to talk to them, on one hand, and express or implied offers of leniency, on the other.'"  Certainly, express or implied offers of leniency by the police in order to get a suspect to talk are per se improper and would establish that the suspect's subsequent statements are involuntary.  (See *People v. Cahill* (1994) 22 Cal.App.4th 296, 311 ["'It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied'"].)  However, once Avalos invoked the right to counsel, the police should not have engaged in any ""'exhortation urging the suspect to talk"'" whatsoever.  (See *Edwards*, *supra*, 451 U.S. at pp. 484-485.)

25

In short, Trapp's statement exhorting Avalos to talk to her (i.e., initiating an encounter) after he said he wanted an attorney, was not allowed under *Miranda* and its progeny, which rendered all subsequent statements by Avalos involuntary.  (See *McNeil v. Wisconsin*, *supra*, 501 U.S. at pp. 176-177 ["If the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a [*Miranda*] waiver and his statements would be considered voluntary under traditional standards"]; compare *Holland v. State* (Fla. S.Ct. 2000) 773 So.2d 1065, 1073 [no police initiation where detective went to cell and specifically said he did not want to talk to defendant about the case, but wanted to ascertain his true name, and upon leaving, detective presented his card to defendant "and said, '[I]f you want to talk to me, you can call me'"].)

Moreover, based on Avalos' state of mind, and all the surrounding circumstances, we find the prosecution also did not establish that Avalos' waiver of his right to counsel prior to the interview on the second day was voluntary, knowing, and intelligent.  (See *Moran v. Burbine* (1986) 475 U.S. 412, 421 [a knowing and intelligent *Miranda* "waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it"].)

Avalos was an 18-year-old high school student.  Avalos' arrest was apparently his first serious encounter with the criminal justice system.  Although Avalos had been arrested for the crime of murder, he repeatedly asked the detectives when he was going to be released.  At one point, Avalos asked, "When, when am I gonna go to court or what?"  Detective Trapp said, "Well I, I'm telling you mijo (son) that, I mean, that all depends on you, you know, and I told you, I said, that you've got a decision to make."  Detective Trapp's repeated exhortations likely gave Avalos the impression that if he simply identified the shooter, he had the possibility of securing his release from custody.  And based on his statements, it appears Avalos had little, if any, awareness or

26

understanding of an attorney's role in the criminal justice system.

In the first interview, Detective Schroepfer read Avalos the standard "*Miranda* rights" and confirmed his understanding of each right. After Schroepfer told Avalos he had the right to have an "attorney" present before or during any questioning, he responded, "What do you mean an attorney like . . . ." Schroepfer reread the admonition. Avalos asked, "That means that *** someone can tell me something like ***." Schroepfer said, "Like an attorney."

And the following day, before the interview with Detective Schroepfer, Avalos asked the officer that had brought Detective Wyatt, "Whatever I tell my lawyer, he's going to tell you the same thing, right?" Wyatt responded, "No necessarily, I *** umm, I want to talk to you about that." And during the interview with Schroepfer, Avalos again asked, "It make [[*sic*]] a difference if I talk to a lawyer first or you guys?" Schroepfer said she could not tell him either way.

Avalos's repeated questions over two days demonstrate he did not have the "requisite level of comprehension" of the role of an attorney sufficient to make a knowing and intelligent waiver of the right to have an attorney present during the questioning. (See *Moran v. Burbine*, *supra*, 475 U.S. at p. 421.) Further, Detective Trapp's statement to Avalos purporting to "care about you getting your story the right way out"—after Avalos said, "I wanna talk to a lawyer"—likely further blurred in Avalos' mind the distinction about the role of an attorney versus that of a police officer.

In sum, based on Avalos' age (18), lack of experience with the criminal justice system (a high school student with no evidence of any prior arrests), and all the surrounding circumstances (e.g., Detective Trapp's statement exhorting Avalos to talk after he had invoked the right to counsel, the cold room, the paper gown, the lack of socks, etc.), we do not find that Avalos made a voluntary, knowing and intelligent waiver of the right to counsel prior to the interview on the second day.

Thus, we hold that it was error for the trial court to admit the second

interview by Detective Schroepfer on the day after Avalos's arrest into evidence during the prosecution's case-in-chief.  We now turn to whether the error was prejudicial.

We review a *Miranda* error under the well-established "harmless beyond a reasonable doubt" standard.  (*Chapman v. California* (1967) 386 U.S. 18, 23-24 (*Chapman*).)  Under *Chapman*, the prosecution bears the burden of proving that the error was harmless.  (*People v. Jackson* (2014) 58 Cal.4th 724, 748.)  That is, the presumption is that we must reverse, *unless* we the prosecution proves the error was harmless beyond a reasonable doubt.  (*In re Martinez* (2017) 3 Cal.5th 1216, 1225.)

The *Chapman* test is a challenging burden for the prosecution:  "The test is not whether a hypothetical jury, no matter how reasonable or rational, would render the same verdict in the absence of the error, but whether there is *any reasonable possibility* that the error *might have* contributed to the conviction in this case.  *If such a possibility exists*, reversal is required."  (*People v. Lewis* (2006) 139 Cal.App.4th 874, 887, italics added.)  And under *Chapman*, we take particular note of a prosecutor's closing arguments.  (See *Kyles v. Whitley* (1995) 514 U.S. 419, 444-445 ["[t]he likely damage is best understood by taking the word of the prosecutor, . . . during closing arguments"].)

"A confession is like no other evidence.  Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him . . . .  [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct.  Certainly, confessions have profound impact on the jury . . . .'"  (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296.)  "Confessions are the most damaging type of evidence in a criminal trial . . . ."  (*People v. Harrison* (2017) 16 Cal.App.5th 704, 710-711.)

"A confession is a declaration, or acknowledgment sufficient to establish guilt of the crime.  [Citation.]  An admission is similar to but less than a confession.  It is 'an acknowledgment of some fact or circumstance which in itself is insufficient to authorize a conviction, and which tends only toward the proof of the ultimate fact of

28

guilt.'" (*People v. Zichko* (2004) 118 Cal.App.4th 1055, 1059, disapproved on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1186-1188.)

During the interview on the second day, Avalos did not make a full confession (he admitted shooting Rivera, but claimed self-defense); however, his statements came very close to a full confession, and certainly constituted admissions, which were repeatedly referred to by the prosecutor during closing argument.

While arguing that Avalos was carrying a gun, the prosecutor contended this was proven by Avalos' "statement way at the very end when he finally came clean about what happened, he was carrying it for protection." The prosecutor stated: "Avalos is armed with this loaded .38 revolver. He eventually admitted this to [Detective] Schroepfer during the second interview with her at the police department . . . ."

Further, the prosecutor argued: "Other statements . . . show that Mr. Avalos intended and killed in this case without lawful reason or justification. Skip to the second interview that he did with Investigator Schroepfer. [Avalos] said he knew Mr. Rivera and [Rivera] always had hate towards him." Referring to the interview on the second day, the prosecutor stated: "Avalos walked over from a liquor store, and while he walked over there at the Mayfair, he was carrying a .38 caliber revolver loaded with . . . six bullets in his right side pocket. He admitted to that. [Avalos] said he saw [Rivera] and another guy so he, Mr. Avalos, started to walk back when the guys ran across and approached him." He also argued: "Mr. Avalos then ran and he said David ran to . . . where that liquor store is, and then when asked why he had a gun, he replied, quote, 'It's crazy on the streets right now.' And, 'I was not planning on using it, I just had it for protection.' [¶] For protection? You went into Citron street. You went looking for this incident. You were not using that gun [for] defensive purposes. You went in there to kill someone. Somebody that you had [a] beef with a week prior at this carwash."

Avalos' statements from the second day's interview were an important part of the prosecution's closing argument to the jury; therefore, we find the prosecution has

29

not proven beyond a reasonable doubt that Avalos' statements during the second interview "'did not contribute to the verdict obtained.'"  (See *Yates v. Evatt* (1991) 500 U.S. 391, 402-403; disapproved on other grounds in *Estelle v. McGuire* (1991) 502 U.S. 62, 72-73, fn. 4; see also *In re Cline* (1967) 255 Cal.App.2d 115, 124 ["Even where there is substantial independent evidence of guilt, the defendant's incriminatory extrajudicial statement may be an 'evidentiary bombshell'"].)

To conclude, we find:  1) the trial court erred by admitting the second interview of Avalos; and 2) the error was not harmless beyond a reasonable doubt.  We note, of course, the prosecution may retry Avalos, because we are not reversing based on insufficient evidence.  (See *People v. Hatch* (2000) 22 Cal.4th 260, 274-275.)

### B.  *Street Terrorism Conviction*

In a supplemental brief, Avalos challenged his criminal street gang (street terrorism) conviction.  (See Pen. Code, § 186.22, subd. (a).)[4]  This is due to statutory changes instituted by Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699, § 3) (AB 333), which became effective while his appeal was pending.  The Attorney General concedes the street terrorism conviction must be reversed.  We agree.

"A person who actively participates in a criminal street gang with knowledge that its members engage in, or have engaged in, a *pattern of criminal gang activity*, and who willfully promotes, furthers, or assists in felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail . . . or by imprisonment in the state prison . . . ."  (§ 186.22, subd. (a), italics added.)

Under the street terrorism statute, a "'pattern of criminal gang activity'" is ordinarily established by the prosecution proving up certain enumerated offenses committed by a gang's members, also known as predicate offenses.  Among other

---

[4] Further undesignated statutory references are to the Penal Code.

changes, AB 333 reduced the number of predicate offenses to those that benefit the gang and that are "more than reputational." (§ 186.22, subd. (e).) Absent a contrary intent, legislative changes that reduce punishment—or reduce the possibility of punishment— apply retroactively to cases on appeal. (*In re Estrada* (1965) 63 Cal.2d. 740, 744-746; *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 307-308.)

Here, Avalos was alleged to have been a member of the ATC criminal street gang. The prosecution established the "'pattern of criminal gang activity'" by proving up the gang's predicate crimes of felony vandalism and unlawful possession of a firearm. However, with the recent statutory changes, felony vandalism no longer qualifies as a predicate offense. (See § 186.22, subd. (e)(1).)

As the Attorney General concedes, Avalos "may be able to benefit from AB 333 on remand if the prosecution is unable to provide additional evidence establishing a pattern of qualifying criminal gang activity that provided a common benefit to the gang that was more than reputational." (See *People v. Figueroa* (1993) 20 Cal.App.4th 65, 71-72, fn. 2 [statutory amendment retroactively adding additional element to offense allowed prosecution to establish additional element on remand without offending double jeopardy or ex post facto principles].)

Thus, because the statutory change applies retroactively, we must reverse Avalos' street terrorism conviction. (§ 186.22, subd. (a).)

### III

### DISPOSITION

We reverse Avalos' murder and substantive gang convictions and remand the matter consistent with the holdings in this opinion.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.

Filed 12/02/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G059107 |
| v. | (Super. Ct. No. 12NF1681) |
| ISMAEL AVALOS, | ORDER FOR PUBLICATION |
| Defendant and Appellant. | |

On the court's own motion, our opinion filed on November 4, 2022, is certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c).

The opinion is ordered published in the Official Reports.

MOORE, J.

WE CONCUR:

O'LEARY, P. J.

BEDSWORTH, J.

1